Chief Justice Robertson
delivered the Opinion of the Court. — .
Judge Underwood dissenting.
This is an action of detinue for two slaves, claimed by the defendants in error, (who were plaintiffs below,) under a deed of trust, whereby Edward Carlton, sen. transferred to them the right to the said slaves, and other property, for the payment of certain debts due by Carlton to persons for whose benefit the trust was created.
Yerdict and judgment, in the usual form, for the slaves, or,their value, having been obtained against Fool, he prosecutes a writ of error, and complains that the circuit court erred to his prejudice — 1st. in refusing to admit certain testimony which was offered by him on the trial; $nd. in overruling a motion for a nonsuit, and 3rd. in refusing to give to the jury an instruction proposed by him.
I: The matter rejected by the circuit court,was a cross bill of discovery, which had been filed by the plaintiff in error against the defendants, and taken for confessed ; in which the only allegation pertinent in this case is, that the debts, for securing which the deed was given, had been “paid, or nearly paid.'” The admission of such an allegation was insufficient to prove, either that the debt had been paid, or that the absolute title had been revest-ed in the alienor; and could not have tended, legitimately, to bar, or affect, the cause of action for which this suit was instituted. But, if the slaves or their value be more than sufficient for the payment of the debts, a chancellor might, in a proper case, afford appropriate relief; but he alone could do full and final justice among all persons who may be eventually concerned.
Evidence, that the defendant— in detinue for slaves,which he had sold, as the agent of another, had some knowledge of, and co-operated to defeat, the title of the lawful owner, v/as proper for thejury, and sufficient to preclude a non-suit.
Anypersonwho has had tne pos session of, and has sold, used, or detained, the property of another — either for himself, or as the agent,or servant, of a stranger — is liable (in detinue) to the true owner, for the property, or its value — whether he was, or was not, conu-sant of the right of the true owner-and whether he had, or had not, parted with the possession, before the suit. See Judge Underwood's opinion, post.
II. If detinue be an appropriate action — and even if a person would not be liable, in any form of action, for disposing of the chattel of another, bona fide, as an agent of a person who was not the true owner, (which we will presently consider,) — nevertheless the circuit judge did not err in refusing to direct a nonsuit; because the jury might have inferred, that the plaintiff had some knowledge of the right of the defendants, and co-operated with his constituent in an effort to frustrate that right.
III. The plaintiff in error moved the circuit court to instruct the jury, “ that if they believed from the evidence, that (he) had possession of the negroes sued for, only as agent of Carlton, and parted with possession of the same before any demand, or suit brought,without a knowledge of the plaintiff’s claim to them, they must find for the defendant.” The refusal to give that instruction furnishes the ground on which Pool mainly relies for a reversal of the judgment.
The proof was, that Pool took the slaves to Missouri, and had afterwards said to one witness, that he knew where they were, and to another witness, that he had sold them ; there is no evidence that he had ever paid to the person who, as he says, employed him to sell them, the price, or any part of the price, for which they were sold, if sold at all. Nor is any such payment even hypothetically stated in the instruction as proposed. In considering the proposition, therefore, the conduct of .the plaintiff should be viewed in the same light as it should be if he had admitted that he had not paid his constituent. A
Thus considering the case, two principal questions arise: First. According to the hypothetical case stated in the instruction, was Pool liable to any action whatever ? Second. Is. detinue an appropriate action ?
First. That Pool’s conduct must be deemed injurious to the owners of the slaves, has not been denied in argument, and cannot be doubted. But his learned counsel insists, that his acts were those of his employer, who is alone legally responsible to the injured party, if, as an agent merely, he (the plaintiff,) acted in good faith and within the scope of his authority. Is such the true and *112 well settled doctrine of the common law ? We think not-: Far — very fár — from it.
The authority of an agent can never exceed that of the principal. —No one can confer upon another a power which he does not himselfpos-sess ; or authorize another to act illegally.— Whoever,being of legal discretion, acts tor-tious'h/, or in-termeddles with tire property of another without his assent,or the authorityoflaw, is personally responsible to the injured party and the fact that it was done as the agent, or by the request, or command, of a third person, is iio excuse.
líe who has no legal right to do a thing, cannot delegate authority to another todo it. The power of an agent, being altogether derivative, cannot exceed that of his principal. As between the person injured and the actual perpetrator of the wrong, no authority from another, who had no right, can change the legal character, or effect, of the wrongful act. The authority, so far as the wrong was concerned, was void, and therefore, cannot protect or excuse the immediate actor. The injured party has a right to look for reparation to him who was actually and immediately employed in the act from which the injury resulte d. He may sue either the principal or accessary, the employer or employed, the constituent or his agent ; and may (generally,) sue either one separately, or both jointly. No person has a right to dispose of the property of another, without his assent,__gr the authority of law ; and if he shall do so, he will,/according to a general rule of law, which has but few exceptions or qualifications, be legally responsible to the owner. As the jus disponmdi does not belong to any person except the owner, or his agent, or the law, he who presumes to exercise that important right without proper authority, must do so at his peril, and upon his own responsibility. It is no legal excuse, that he acted as the voluntary or hired agent of another person who had no such right himself. The agent cannot avert legal responsibility for his own wrongful act, by pleading that he was employed, or directed, by a person who had no lawful authority/fit is a general rule of law, that no person of legal discretion, whose voluntary act operates injuriously to the property of another, can exonerate himself from liability to the owner for reparation, by merely proving that he did not act for himself, but for another, who hired or requested him so to act, and who had no legal right to use, detain, or dispose of the same property in the same way. An •agent, or servant'is responsible for his own tortious act, even though it was done in submission to the command, or authority of his employer or master. See Paley on Agency, 315-16, and the cases there cited.
*113 In note 23 to Chitty's Blackstone, (Vol. 1 p. 432,) the annotator says : “In every case where a master has not power to do a thing, whoever does it by his command, is a trespasser, (Rol. Jib. 90,) and this though the servant acted in total ignorance of the master's -right. — (2 Rol. Ab. 431.”)
The reason is stronger why a voluntary -agent should be liable in a similar case. See 5 Burr, 2687.
Exercising unauthorized dominion over the property of another, or even asserting a right to it for another who has no right, may be, and generally will be, iorong-> ful or “tortious" as to the owner. See 2 Strange, 813. 2 Saunders Reports, 47, n. e. Bristol vs. Burt, — 7 Johnson's Reports, 256. Shotwell vs. Few, — Ibid. 302, and Murry vs Burling, — 10. Ib. 172. Perkins vs. Smith,— 1 Wil. 328.
In Perkins vs. Smith (supra,) a servant was held liable, in trm¡^«j|tóoods which-he had received from a bankrupt, when his bankruptcy occurred,) and had sold, at themaster’s request, to pay a debt due from the bankrupt to the master. It does not appear from the case, as reported, that the servant had notice of-the bankruptcy. In that case, Chief Justice Lee said¡^“The point is, whether the defendant is not a tortfeasor, for if he is so, no authority that he can derive from his master can excuse him from being liable in this action. ^Hughes, the bankrupt, had no right to deliver these goods to Smith ; the gist of trover \j the detainer, or disposal, of goods, which are the property of another, wrongfully; and it is found that the defendant himself disposed of them to his master's use, which Ms master could give him no authority to do; and this is a conversion in Smith, the disposal being his own tortious act, the act of selling the goods is the conversion, whether to the use of himself or another, it makes no difference.'^
Parker et al. vs. Godin, (Strange, 813,) is a still stronger case. The wife of a bankrupt delivered to a servant plate to sell ; the servant, delivered it, near the door of a pawn-broker, to Godin, who pawned it in his ownvname, and delivered the money to the mistress. The 'assignees recovered damages from Godin, in trover.
*114 In a post-revolutionary case (in King’s Bench,) a mew chant’s clerk was held liable in trover, for goods which he sent to his employer, although they had been delivered to him for that purpose, and he did Hot know that neither the bailor, nor merchant, had any right to them. In that case, Lord Ellenborough said : — “ The clerk acted under an unavoidable ignorance, and/or his master’s benefit, when he sent the goods to his master ; but, nevertheless, his acts may amount to a conversion ; for a person is guilty of a conversion who intermeddles with my property, and disposes of it, and it is no answer that he acted under authority from another, who had himself no authority to dispose of it. Jlnd the com1 is governed by the ‘principle of law, and not by the hardship of any particular case.” Perkins vs. Smith, (supra,) Cooper vs. Chitty, 1 Burr. 20, and other cases were cited in that case.
In another case, the same Judge said : — “ According to Lord Holt, (in Baldwin vs. Cole,) the Myssuming to onesself the property and right of dis^^HBFanother man’s goods, is a conversion , and certarakw- a man is guilty of a conversion who takes my property! by assignment from another who has no authority to dispose of it, for what is that but assisting that other in carrying his wrongful act into effect 9
In 6 Modern, Lord Holt said — “ Jlny disposing of another’s property without his authority, is a conversion.”
The foregoing cases and extracts are presented to prove, not only that an unauthorized bailment cannot, according to a general principle of law, exonerate the bailee from legal liability to the true owner, for any injury to the property, or to its propriet or, resulting from the voluntary act of the bailee, but also that the quo animo, or motive, is not generally essential to his liability for reparation, or restitution, to the person whom, ignorantly or Wantonly, he had injured.
The rule thus recognised depends on an obvious principle, sustained, (we think,) by analogy, justice, and authority. It is, that he, whose voluntary act, whether for himself or another, operates injuriously to the rights of another, shall be responsible to the person who may be injured by'the wrongful act. The security of rights— *115 property itself, would be injuriously affected by the repudiation of a principle so just and so universal.
Purchaser of a chattel,from one in possession, who had no title, nor authority to sell, is responsible for the value, to the true owner.
An agent, who sells a chattel for one who had -no right to it, and is made responsible to the owner,must look to his employer, for indemnity.
^ Possession of a chattel is one indicium of title. But a purchaser, or bailee, who, trusting to that assurance of title in the possessor, or to his honor, veracity or warranty, must do so at his peril. A purchaser of a chattel from a person in possession without title or authority to sell, will be responsible to the owner for its value even though he had, after paying his vendor a.full price,given the property to him. He trusted to the vendor and to his possession, and for so doing, might be subjected to a double loss — the price he gave, and also the value to the owner. He acted on the presumption of title in the vendor, and upon the security to be expected from an express or implied warranty of title^
The agent who, for hire or otherwise, sells a chattel for another in possession without right, must likewise look to his employer, for indemnity for his liability to. the true.owner. In assuming the right to dispose of the property, he injures the owner, and acts upon his own responsibility. If his principal be able to indemnify him, he will sustain no eventual loss. If the principal be insolvent, that must be the misfortune of his rash or confiding agent. In that event, it is more just that the agent should suffer the consequences of his own wrongful conduct, (especially if he received a reward for. his service and so far acted for his own benefit,) than that the owner, whose rights had been outraged, should be denied any redress. As between the wrong doer, and the person injured, it is not material whether the injurious act was for the benefit of the actor, or for himself and another person, or for that other exclusively ; nor is it essential that the actual perpetrator should have known that his authority was insufficient.
Every person who' ventures to dispose of the property of another, without his authority, or that of the law, acts injuriously to the owner, and, therefore, in contemplation of law, tortiously.^If A tell B to shoot a horse for him, asserting that it is his (A’s) horse, and B accordingly kill it, may not C, the right owner of the horse, maintain ah action against B, for killing it, without his *116 authority ? and will B’s ignorance of C’s right excuse {¡lc wrong, or exonerate him from responsibility for the injury ? Surely not — such is not, — should not be, the* law. I‘f A steal the slave of B, and, whilst in possession-, employ C to assist him in carrying the slave to Missouri, and there selling him, may not B sue-both A and C, severally, or jointly, for a- trespass on his rights ? and could C excuse himself by pleading that he was only the instrument of A, and did not know that the slave was not his ? Certainly a joint suit might be maintained againt A and C, and if the latter should be compelled to pay the whole of the damages, he could not recover contribution from
A sheriff who levies on, and sells, property represented,and believed (without any suspicion to the contrary) by him, to be the property of the def’t in the ex’on,but which turns out to be the property of a stranger, is liable to the stranger for its value.
A, unless he could do so on the ground of an implied guarantee.
A sheriff, who is not only a public agent, but may also be deemed sometimes an agent of both creditor and debt- or, having a fieri facias in favor of A-, against B, levies it, at the request of both of them, on slaves in the possession of B, and accordingly sells them,without knowing, or even suspecting, that any other person than B has title to them. But C afterwards sues the shériff, in trespass or trover, for selling the slaves, and proves, that, at the time of the, sale, he himself, and not B, was the true and exf elusive owner of them, may he not recover their value ? indisputably. Neither the good faith, nor ignorance, of the sheriff, nor the combined authority of B, and of the execution, nor all of them united, could exonerate him from legal liability t-o C, whose rights he had invaded, from whom he had derived no authority, — and as to whom, therefore, he had acted tortiously and injuriously. Is there any reason-for exempting a mere private, voluntary agent from the like liability for a similar 'act ? We have not been able to perceive any. “ Tortious ” is applied to an act, the offspring, not of accident or of legal or physcial necessity, but of sound volition, and which operates injuriously to another person who did not assent to-it, and as to whom it was without authority. This is (as we think) abundantly shewn, not only by tbe more ancient authorities, but by post-revolutionary and unau-thoritative cases, from which we have made some quotations, only to prove that the law, as we understand it and *117 apply it to the facts of this case, has never been shaken, but, even yet, is considered, well established in England, the natal land of the common law.
Assumpsit wili not lit) against, an agent, uuore ceivetf tiie money to wnich a strangei; was entitled, and without knowing oi‘ the stranger’s right, paid it o-vei 'to ins p¿in-cipal — tor the law wiiliioi vm-ply a j.rüVÁse. to whore there was no. knowledge of the right to receive.
Ji i ,../£<*■ Jiuc bai-lee til j;uó£¿iS~ SÍO/¿} ¿Buy no', be nabit . it- *• out a hen t J. anti icíuíhú.; , ■ , iron, t ¿y c ¡ prí.ioiu^ * bill, . suit
It does not appears that, in any one of the cases to which we have referred, any stress was laid on the edge or ignorance (by the agent) of the true proprietorship. The reasoning, in all of them, tends to shew, that the principle of liability was the want of authority in the constituent.
Though Godin pawned the plate in his own name, it was for the benefit altogether of the bankrupt’s wife ; and it is not stated, nor is it fairly inferrible, that he knew that the plate belonged to the plaintiff, in the action against him. And it appears strange, that, if the fact that the agent was ignorant of the legal proprietorship, would legalize, or excuse, his disposition of the property, all the cases had net stated that the ground of his liability was, that he knew that his employer was not the owner. But not one of them even intimates, that that is the only and true ground of his liability ; all seem to consider the want of authority to be the legal ground.
If an agent receive money for his principal, and pay it over to him, supposing it to be his, assumpsit cannot be maintained against him by a stranger who may have been, in fact, entitled to it. The reason is obvious : the law would not imply a promise to pay the money to any one who was not known to be entitled to it. So a bona fide bailee, in possession, may not be guilty of a conversion before a proper demand and refusal. But if he sell the property, whether for himself or his bail- or, no demand is necessary by a stranger who is the real owner. The sale is itself a conversion, and is, as to the owner, tortious in law SC
Now, as the plaintiff" in error voluntarily took the slaves of the defendants from their constructive possession, and, without their consent," or any legal authority, carried them to Missouri, and there disposed of them, it seems to us that, according to both law and natural justice, there should be no doubt, that he should be responsible to them, for an illegal interference with their property • and that they should not be compelled to hunt for *118 another, whom they may never find, and who, when found, might be insolvent. The plaintiff's contract with his employer cannot affect the rights of strangers to that contract. In disposing of the slaves he acted illegally, because he had no legal authority ; and it cannot be denied that a conversion of the slaves to the use of his principal, was as injurious to the defendants, as a conversion to his own use could have been. Even, it does not appear, that his agency was not beneficial to himself; nor is there any intimation, in this whole record, that he had not, at the trial, the price of the slaves in his own pocket, and apart of it converted to his men use,for compensation. lie must be deemed a wrong doer, and is, therefore, liable for the property which he detained and converted. As a free agent, he must be responsible for his own voluntary acts, injurious to the defendants and without their authority. Ills is a stronger — much stronger case than any of those which have been quoted. In all of them, the proceeds had gone to the principal, before suit brought against his agent.
Detinue may be maintained against a defendant who has had possessionofthe chattel sued for, but has parted with the possession (without being dives'ted of it by authority of law,) before the date of the writ.
*118 In deciding the question of liability in this case, we have referred to other cases and authorities for the purpose.. of establishing the legal doctrines which apply to the facts as stated in the instruction, and should determine their legal effect. We have not intended to decide other and fictitious cases, which might be imagined, but will not be adjudged until they, shall be judicially presented. Nor shall we feel responsible for any miscon-' ception, or misapplication, of any authority, or dictum, which we have quoted or cited. The principles which govern this case, are well settled and clearly defined. It is not our business to enumerate or classify all other cases to which they should be equally applicable, or those cases of finding or of mere bailment, to which they might not apply.
II. But is detinue maintainable ? We think it is. Since the case of Burnley -vs. Lambert (2 Wash. 308,) it has been considered, thabproof of possession by the defendant, at the date of the writ, is not necessary in an action of detinue. In Southcote's case (4 Co. Rep. 83,) detinue was *119 maintained against a bailee (to keep safely,) after be had been robbed of the thing bailed.
In many cases it would be difficult to ascertain the motive which induced a defendant to part with the property prior to the institution of the suit for it. And surely the right to maintain detinue, cannot depend on grounds so precarious and delusive as the fact that the defendant was in the possession at the date of the writ, or at the time of its service, or the fact that, in parting with the possession prior thereto, he had acted wantonly or in bad faith. Such a metaphysical enquiry as the latter, seems not to be required by principle or authority, and would, were it required, tend to the subversion of the action of detinue. The plaintiff had rendered himself liable to the action of detinue, by taking and detaining the slaves from the legal owners. Did he, by his own voluntary unauthorized, and therefore illegal act, in selling the slaves, exonerate himself from the pre-existing liability ? We think not. If he cannot surrender the slaves, he may be released by paying their assessed value. But for aught this court knows, or the defendants in error can be presumed to have known, or yet to know, the plaintiff may be able to surrender the slaves in obedience to the judgment, and may, perhaps, yet do so. The defendants prefer the slaves to their estimated value. If the plaintiff sold them, he had no right to do so, and passed no title to the purchaser. Why should the defendants be compelled to go to Missouri to sue in detinue ? Why may they not maintain detinue against the man, here,who took their slaves from this state and detained them, and not only detains them yet, in contemplation of law, but may have them within his power ?
According to the case of Burnly vs. Lambert, the fact that the plaintiff was. not possessed of the slaves when this suit was brought, cannot change, or affect the remedy, unless he had been “ legally evictedThis doctrine, if interpretted literally, may be too restrictive. But it seems to be free from just exception, if understood as we suppose it ought to be, to mean that the plaintiff had been divested of the possession in a manner authorized by lato, and which would, therefore, exonerate him from *120 the charge of tortious conduct. But as his employer could have delegated no more power than he possessed, or could himself have rightfully exercised, his authority to the plaintiff to sell the slaves, did not legalize or excuse that which, if done by himself, would have been a trespass.
An innkeeper, who receives the horse of a guest (as he is bound to do,) merely to shelter and feed him, is not answerable to the true owner of the horse.— But by the sale, exercise of control over, or detention of, the horse, without the sanction of tlie owner, the innkeeper would be rendered lia-No.
No judgment had been obtained against the plaintiff recptiring the surrender of the slaves to the person to whom he delivered them ; nor did he deliver them to any person who had a right to demand them, orto whom he was under any obligation whatever to surrender, or to restore them. He voluntarily and illegally sold them ; and consequently, he was not “ legally evicted,” nor did he part from the slaves in a manner authorized or sanctioned by law. And we are, therefore, of the opinion that the action of detinue may be maintained against him, even though he had been ignorant of the right of the defendants when he sold their slaves. It is a general rule that whenever trover may be maintained for the conversion of a chattel, detinue may be maintained between the same parties, if the chattel be susceptible of identification and restitution. And we perceive no sufficient reason for excepting his case from the general rule.
We have been asked by the plaintiff’s counsel,whether an inn-keeper who, in good faith, had received into his .stable and fed a horse, for and at the instance of a guest who was the ostensible but not the true owner, would thereby subject himself to an action of detinue by the owner ? We answer, mo ; because he would not be liable in any form of action. Nothing which he did, should be deemed wrongful or illegal. It was his duty to receive the guest and the horse which he rode, and to furnish shelter and food to both the man and the beast, if requested to do so. Even the possession of the horse whilst tints in the stable- of the inn, should be deemed to have been in the guest, and not in the host; .and, of course, the latter would not be liable to trover or trespass. But had he detained the horse for his bill, and. thus exercised dominion or proprietorship, or had he sold, or otherwise converted the horse without the sanction of the true *121 •owner, he would have been liable to him, in trespass, trover or detinue, according to circumstances.
Trespass, iro-against who car-gSL tWprop-erty of another seilt. 113 as"

Judge Underwood’s Opinion.

Many other fictitious cases might be stated, for exemplifying the principle of legal liability-, by which this case must be tested. But further illustration -is deemed superfluous. This is a well defined case. It is not ebscur-ed by the twilight near the line separating cases of liability from such as are not governed by the same principle : and it cannot be excepted from the full and decisive operation of the principles recognised and established by some of the foregoing, and many other similar authorities.
It does not become necessary now to decide, whether or not the plaintiff could have been made liable to his employer for the nonperformance of his undertaking io sell the slaves, if instead of selling, he had delivered thern to the defendants; nor whether or not this action could be maintained against him, had he, instead of selling, restored the slaves to his bailor. He did neither of those things ; but by the asportation and sale, did an injury to the plaintiffs, for which they had a right to hold him responsible, in trespass, trover, or detinue.
It may not be improper to suggest, that Story, in his treatise on bailment, shews that, if detinue had been brought against Pool whilst he was in possession, he could not have exonerated himself by restoring the slaves to his bailor, any loose dicta in Rolle, Bacon, or elsewhere, to the contrary notwithstanding. But that point is not involved in this case.
Wherefore, it is the opinion of this court (Judge Underwood dissenting,) that the judgment of the circuit court be affirmed.