## JONES *vs.* FORT.

[ACTION TO RECOVER DAMAGES FOR LOSS OF SLAVE ACCIDENTALLY KILLED.]

1. *Whole conversation admissible, when part has been proved.*—When a part of a conversation has been proved by one party, the other has a right to call for all that was said at the time relating to the same subject-matter.

2. *Admissibility of evidence rebutting negligence.*—Under a count in trover, to recover damages for the loss of a slave, who was accidentally killed while employed in raising a gin-house for the defendant; the plaintiff having adduced evidence, tending to show that, on account of the weather and the condition of the timbers, it was imprudent to attempt the work on that day, it is competent for the defendant to prove, in rebuttal, that the work was undertaken after consultation among the persons present as to the propriety and safety of so doing.

Jones v. Fort.

3. *Abstract charge.*—A charge cannot be considered abstract, when there is any evidence, however weak, tending to support it.

4. *Charge objectionable for obscurity or generality.*—A charge which is not abstract, and which asserts a correct legal proposition, though it may be objectionable for generality and obscurity, or calculated to mislead the jury, is not an error which will work a reversal: the party who supposes himself injured by it, should ask an explanatory or qualifying charge.

5. *Charge invading province of jury.*—A charge which assumes a fact as proved, when the evidence only tends to establish it, is an invasion of the province of the jury.

6. *Rights and liabilities of hirer of slave.*—Under a general contract of hiring, the hirer has no right to employ the slave in assisting to raise a gin-house on his plantation, or to hire or loan him to another to be so employed, if that service involves greater danger than prudent masters are usually willing to have their slaves exposed to; yet, if the slave is hired for the specific purpose of being employed as a plantation hand, and it becomes necessary to erect a gin-house on the plantation during the term, and that service is commonly performed by plantation hands whenever it is needed, the hirer is authorized to employ him in that service, provided he exercises due care and prudence to prevent accident or injury ; but he cannot, under such special contract, hire or loan the slave to another, for the specific purpose of being employed in raising a gin-house.

7. *Admissibility of evidence of custom.*—In an action by the owner, against the sub-bailee of the hirer, to recover damages for the loss of a slave, who was accidentally killed while assisting to raise a gin-house on the defendant's plantation, (the contract of hiring being general in its term,) although it may be competent for the defendant to prove that prudent masters generally are in the habit of employing their own slaves in that service when necessary, he cannot prove a local custom among planters to send their own and their hired slaves to assist their neighbors in raising gin-houses.

8. *When sub-bailee of hirer is liable in trover.*—If the hirer of a slave, under a contract either general or special, gratuitously lends him to another person, for the specific purpose of being employed in raising a gin-house, and the slave is killed while so employed, the sub-bailee is liable to the owner for his value, in trover, no matter what degree of care he exercised in having the work performed.

APPEAL from the Circuit Court of Dallas.

Tried before the Hon. NAT. COOK.

THIS action was brought by Rachel M. Jones, against Elias W. Fort and Gabriel H. Fort, to recover damages for the loss of a slave, who was hired by the plaintiff to

one Squire Lowry, for the year 1858, was loaned by said Lowry, during the term, to the defendants, to be employed in assisting to raise a gin-house on their plantation, and was accidentally killed while so employed. The original complaint contained only a count in trover, in the form prescribed by the Code; but, by leave of the court, two addititional counts were afterwards inserted in the complaint, as follows: " And plaintiff claims of defendants the further sum of $3,000, as damages, for that the plaintiff, being the owner and proprietor of a certain other slave, named Orange, on, to-wit, the 1st January, 1858, hired said slave to one Squire Lowry, for the year 1858; and before said term of hiring had expired, to-wit, on the 24th December, 1858, the said defendants wrongfully, and without authority from any one authorized to allow the same, took said slave from and out of the possession of said Lowry, and put him to dangerous and hazardous work, to-wit, to aid and assist in raising and putting up the timbers and frame of a gin-house; and while said slave was so engaged, so wrongfully under the control of said defendants, in raising said gin-house, certain of the timbers fell on and struck said slave, who, in consequence thereof, then and there died; and plaintiff has wholly lost and been deprived of her reversionary interest in said slave; to her damage, $3,000. And plaintiff claims of said defendants the further sum of $3,300, as damages, for that said plaintiff, on the 1st January, 1858, was the owner and proprietor of a certain other slave, named Orange, and hired said slave to one Squire Lowry, for and during said year 1858; and during said year, and before said term of hiring expired, said slave was wrongfully and illegally taken in the possession and employment of said defendants, without any authority or permission from said Lowry, and, while so in the employment of said defendants, was used and employed in raising a gin-house, and was then and there killed, by certain of the timbers falling upon and striking him; to plaintiff's damage as above stated." The defendants demurred to the complaint as amended, and to each count thereof, for a misjoinder of counts, and because it was,

not averred that the defendants had notice of the plaintiff's title to the slave when they took possession of him; but their demurrer was overruled. The record does not show what pleas were interposed.

The material facts of the case are these: Squire Lowry, who was the son-in-law of the plaintiff, hired from her the slave Orange, with two others, for the year 1858, and gave his note for the aggregate amount of their hires; "which note was general in its terms, not expressing the employment in which said slaves were to be engaged, or where their services were to be rendered." Said slave was employed by Lowry as a field hand on his plantation, which was about sixteen miles from Marion. On the morning of the 22d December, 1858, Lowry was on his plantation, and went from thence to Selma; leaving his overseer on the place, but understanding that the overseer intended to leave on the next morning, to be absent until the 24th. Lowry's two sons, both of whom were over twenty-one years of age, were also on the plantation at the time, having gone down there for the purpose of hunting; and after the overseer had left, on the morning of the 23d, they were the only white persons on the place. On the morning of the 24th December, before the overseer had returned, the defendants, who were planting together on a place about a half-mile from Lowry's, sent a negro boy over to his plantation, requesting the loan of four hands to assist in raising a gin-house; and one of Lowry's sons sent over four negroes, including the boy Orange, for that purpose. Lowry returned from Selma on that morning, and was on his plantation two or three hours; but, as he testified, he knew nothing about said slaves having been sent to the defendants' plantation, until about one o'clock, when he was informed of the fact by his son while he was awaiting the arrival of the cars at the station-house; and a messenger from the defendants came, a short time after, to inform his son that the boy Orange had been killed while assisting to raise the gin-house, one of the timbers having accidentally fallen upon him.

Lowry, who was introduced as a witness by the plain-

tiff, testified, that neither his overseer nor his sons had any authority to send the slaves to assist in putting up the defendants' gin-house; "on the contrary, that he had expressly ordered his overseer, prior to said 22d December, not to send any of the negroes under his control to aid in raising a gin-house or screw, unless said overseer himself accompanied them." His two sons, who were introduced as witnesses by the defendants, testified, that they had nothing to do with the management or control of their father's plantation or slaves; and the one by whom the slaves were sent to the defendants' plantation stated, "that he did so thinking he was doing a neighborly act," and that he did not know at the time that Orange did not belong to his father. Lowry's overseer, introduced by the defendants, stated that, on two former occasions during the year 1858, he had sent slaves from the plantation to assist neighboring planters in raising gin-houses. "On cross-examination by plaintiff, said witness was asked, if the defendants' overseer did not, on the 22d December, apply to him for help to raise a gin-house on the next day; and he answered, that he did, and that he (witness) did not send the negroes on account of the death of a negro on the place, who was to be buried on the next day. The defendants then asked said witness, what he said to defendants' overseer about sending help to raise said gin-house; and he answered, that he told said overseer he would send to help him on the next day if any of the negroes on the place did not want to go to the funeral. To this question and answer, each, the plaintiff objected, and reserved an exception to the overruling of her objections."

The plaintiff introduced evidence showing, "that the raising of gin-houses was not the common, ordinary service in which slaves were accustomed to be engaged, but was extraordinary, and out of their usual course of labor; that it was always a hazardous and dangerous business, and particularly so in wet weather; that a good deal of rain had fallen a day or two before the 24th December, and it rained there that morning; and that the ground and timbers were wet." The defendants offered evidence,

on the other hand, "tending to show that it was the settled custom in the country, in the neighborhood of Squire Lowry's plantation, to employ slaves in the raising of gin-houses and screws, and for one neighbor to send his slaves to assist another, without charge, whenever such work was to be done; that such services were thus rendered, whether the slaves belonged to the person sending them, or were only hired for a time; also, that the defendants' gin-house was raised in the usual way, under the superintendence of a competent and skillful workman, and that all proper care was taken to prevent accidents. In this connection, the court allowed the defendants to prove, against the plaintiff's objection, "that on the morning of the 24th December, before they commenced the work of raising said gin-house, they held a consultation with the other persons present, to determine whether it would be safe to go on with the work on that day, and that they decided it would be safe;" and to the admission of this evidence the plaintiff reserved an exception.

"The above being the substance of all the evidence in the cause, the plaintiff insisted before the court and jury, among other points, that the defendants had acquired the possession and control of the slave Orange without authority from any one authorized to give it; and, said slave having been killed while in their employment, that defendants were liable to plaintiff for his value at the expiration of the term of hiring; that said slave came to his death by the negligence and recklessness of defendants while in their possession; that the raising of gin-houses was extraordinary service, and not the usual employment of slaves; that said slave being killed while raising a gin-house in the defendants' employment, they were liable to plaintiff for his value; and that plaintiff was not chargeable with notice of the custom about sending slaves to assist in raising gin-houses, and was not bound thereby, inasmuch as it was shown that plaintiff resided near Marion, while said custom existed in the neighborhood of Lowry's plantation, sixteen miles distant from Marion."

The court charged the jury, in writing, as follows:

Jones v. Fort.

" 1. If the evidence shows that the slave was in the defendants' possession by the authority of Lowry, the hirer, then their possession was not illegal.

" 2. If the defendants' possession was lawful, then the plaintiff is not entitled to recover, unless she proves negligence on the part of the defendants.

" 3. In determining whether Lowry authorized or consented to the defendants' possession, the jury may look to the fact, (if it be proved,) that he knew said slave was in their possession, and made no objection thereto.

"4. If the jury believe, from all the evidence in the case, that John Lowry had authority, express or implied from the conduct of his father, to send said slaves to defendants, and did so send them, then the plaintiff is not entitled to recover, unless the defendants are shown to have done some act wrongful in its nature, or to have omitted some duty in reference to said slave; and to show an implied authority from Squire Lowry to John Lowry, the jury may look to all the evidence in the cause, and to the conversation and conduct of Squire Lowry when informed that his son had sent the slave to assist the defendants; and if such authority arise by implication from the conduct of Squire Lowry, it is as good as if it were express.

" 5. If the jury believe from the evidence that, in January, 1858, it was a custom of the country, in relation to slaves, that one planter would send his slaves, without compensation, to work for a neighbor in erecting gin-houses, then plaintiff is charged with notice of this custom, if she hired her slave to Squire Lowry in the country, and to be employed in the country where said slave was to be employed by said Lowry.

"6. If the jury believe from the evidence that the defendants' possession of the slave was acquired without any wrongful act on their part, or on the part of either of them, and without any assumption of ownership on their part; but that the slave was in their possession without any notice that the plaintiff had a claim to the slave, and was put into their possession by a person claiming to exercise ownership over said slave, and was accidentally killed while in their possession, without any

fault on the part of the defendants, or either of them, the jury should find for the defendants."

The plaintiff excepted to each of these charges, and then requested the court to instruct the jury—"1st, that if they believed the evidence, they must find for the plaintiff; and, 2d, that if they believed the evidence, they must find a verdict for the plaintiff against the defendant Elias Fort." The court refused each of these charges, and the plaintiff excepted to their refusal.

The rulings of the court on the evidence, the charges given by the court, and the refusal of the charges asked, are now assigned as error.

BROOKS & GARROTT, for appellant.

BYRD & MORGAN, *contra.*

R. W. WALKER, J.—1. The plaintiff having brought before the jury a part of the conversation between the overseer of the defendants and the overseer of Squire Lowry, in reference to the application which the former made for hands to assist in raising the gin-house, the defendants had the right to the whole conversation having relation to the same subject-matter.

2. The complaint contained a count in trover; and the bill of exceptions states, that the plaintiff insisted, before the court and jury, "that the slave came to his death by the negligence and recklessness of defendants while in their possession." There was some evidence offered, the obvious purpose of which was, to show that the gin-house was raised under circumstances which rendered it imprudent to attempt the work at that time. To repel the presumption of negligence and recklessness which such evidence had a tendency to create, the fact that the work was undertaken after consultation as to whether it was safe to proceed with it on that day, was admissible in behalf of the defendants.—Ala. & Tenn. R. R. Co. v. Burke, 27 Ala. 541.

3-4. A charge cannot be considered abstract, when there is any evidence, however weak, tending to support it.—Hair v. Little, 28 Ala. 236; Partridge v. Forsyth,

Jones v. Fort.

29 Ala. 200. We cannot say that there is *no* evidence, to which the first three charges are applicable; and, as they assert correct legal propositions, we cannot reverse on account of them, although it may be that they were objectionable for generality and obscurity, and calculated to mislead the jury. If the plaintiff desired any modification or qualification of the charges, she could have attained her object by a prayer for additional instructions from the court.—Reavis' Dig. 319, § 60; Skinner v. State, 30 Ala. 524.

5. As we understand the 4th charge, it assumes as a fact, that Squire Lowry was informed, before the slave Orange was killed, that his sons had sent the slave to assist the defendants. The utmost that can be said of the evidence is, that it has some tendency to establish this fact. The charge was, therefore, an invasion of the province of the jury.—McDougald v. Rutherford, 30 Ala. 253; Shepherd's Dig. 460.

6–8. It is a mistake to suppose that the bailee of a slave, under a contract of hiring which is general in its terms, without express restriction as to the nature or place of employment, has all the rights of a master during the period of bailment, and may use or employ him in any way, or at any place, where or in which the master could lawfully use or employ him. A master may, if he chooses, set his slave to blasting rock, immure him in an unhealthy mine, or put him before the mast on a distant voyage; but the hirer, under a general contract of hiring, has no right to do any of these things. Such a bailee is entitled to make such use, and bound to take such care of the slave, as prudent masters usually do of their own negroes. The legal effect of the contract is, that the hirer is authorized to employ the slave, or to bail him to another to be employed, in any business to which slaves are ordinarily put, and which is not attended with extraordinary peril to his life or health. This is but another mode of stating the proposition, that the contract limits the labor in which the slave may be employed to such service as prudent men would usually be willing to engage their own slaves in.—Seay v. Marks, 23 Ala. 532; Ala. & T.

Railroad Co. v. Burke, 27 *ib.* 540; Spencer v. Pilcher, 8 Leigh, 565, (582–3;) Mullen v. Easley, 8 Humph. 428; Jones v. Glass, 13 Iredell, 308; McLauchlin v. Lomas, 3 Strobh. 85; Latimer v. Alexander, 14 Geo. 260, (267;) 3 S. & M. 142; Swigert v. Graham, 7 B. Monroe, 661; Hawkins v. Pythian, 8 B. Monroe, 515.

But, where a slave is hired for a particular purpose, the owner agrees to take the risks incident to his employment in that service; and therefore, he may be set to it, and kept at it in the usual way, without regard to the degree of danger involved in such work.—Nesbitt v. Drew, 17 Ala. 379; Heathcock v. Pennington, 11 Ired. 640; Gorman v. Campbell, 14 Geo. 137; McLauchlin v. Lomas, 3 Strob. 85; Sims v. Chance, 7 Texas, 561; Williams v. Taylor, 4 Por. 234; Lansford v. Baynham, 10 Humph. 267. On the other hand, it is a breach of the contract, for the hirer to put the slave to any other service than that for which he is hired; and especially is this the case, where the service to which he is put involves more danger than the ordinary duties of the service for which he was hired. Authorities *supra;* Hooks v. Smith, 18 Ala. 338; Bedford v. Flowers, 11 Humph. 242; Angus v. Dickerson, 1 Meigs, 459; Duncan v. Railroad Co., 2 Rich. 613.

When, therefore, a slave is hired to be worked on a plantation, the hirer has the right to employ him in any part of the ordinary labor of the place. Whatever belongs to the customary routine of work on the particular plantation on which he is hired, may be justly supposed to have been in the contemplation of the master when he made the contract; and all such service, therefore, falls within the scope of the bailment. Moreover, we know that gin-houses, corn-cribs, barns, and negro-cabins, constitute a necessary part of every well-ordered plantation, though the work required in erecting and repairing them may only be performed at considerable intervals of time, and may, therefore, be considered an exceptional service, somewhat out of the usual routine of plantation labor. And our opinion is, that where a slave is hired for the specific purpose of being worked on a plantation, if the raising of a gin-house becomes a necessary or proper

Jones v. Fort.

part of the business of the plantation during the term of hiring, *and is such work as is commonly performed by ordinary plantation hands whenever it is needed*, the hirer would he authorized to employ the slave in it, provided due care and prudence are exercised to prevent accident or injury.

But it does not necessarily follow, that he would be authorized to loan or hire him to another, for the *special purpose* of assisting in such work. The hirer is authorized to engage the slave in such work, not because that is the special service for which he was engaged, but because, in the regular course of affairs on the plantation, it has happened to become an incident to, and a part of, the general business for which he was hired. But the loan of the slave to another, for the specific purpose of raising a gin-house on his plantation, would not be a bailment for the same general business for which the slave was hired, or for any of the ordinary services of that business; but for a single service, which forms only an exceptional and occasional branch of plantation work, and in which the slave can be properly employed only when it becomes fairly, and in the regular order of events, an incident to the general business of the plantation whose customary routine of labor he is hired to perform. In the one case, the service is performed because, in the regular course of events, it becomes an incident to the general business in which the slave is engaged; in the other, it is performed because the bailment is for that special employment, not for a general business in the regular course of which that particular service has become necessary. And if such service is in fact attended with more danger than the ordinary labor required of slaves on a plantation, our opinion is, that the hirer of a slave, to be employed as a hand on a plantation, would not be authorized to lend him to another for the *specific purpose* of assisting in raising a gin-house.—McLauchlin v. Lomas, 3 Strobh. 87, (90). Such a loan would as effectually change the nature of the service for which the slave was hired, as if the hirer should bail him to a mechanic, for

the purpose of being employed in the raising of gin-houses throughout the entire term of the hiring.

On the other hand, if a slave is held under a general contract of hiring, the hirer may make such use of him as prudent masters usually make of their own slaves; in other words, the only limit upon his authority is, that he must not employ him in any service which involves extraordinary peril to his life or health. The legal effect of such a contract is, to deny to the hirer the right, as between himself and his bailor, of lending or rehiring the slave for the specific purpose of being engaged in any service which involves more danger than prudent masters would usually be willing to have their own slaves exposed to ; for that is the degree of danger meant by the expression "extraordinary peril." If the raising of a gin-house does in fact involve the degree of danger just defined, then the legal effect of the general contract of hiring is, to deny to the hirer the right of lending the slave for the specific purpose of assisting in such work. And no such right on the part of the hirer can be imported into the contract, by proof of a local custom among planters to send their slaves, as well those hired as their own, to assist their neighbors in raising gin-houses. "A particular usage may be given in evidence, to influence the construction of a contract, or to explain the sense in which words or terms are used; but, when the contract is established, and is not governed by the commercial law, it is not allowable to change its character, and attach to it conditions in opposition to the established rules of law." Petty v. Gayle, 25 Ala. 422. Custom cannot overturn the positive requirements of the law, or the express contract of the parties, or make the legal rights or liabilities arising out of a given state of facts other than they are by the common law.—Barlow v. Lambert, 28 Ala. 709; West v. Ball, 12 Ala. 340; Cadwell v. Meek, 17 Ill. 220; Foley v. Mason, 6 Maryland, 37 ; Bedford v. Flowers, 11 Humph. 242. When the question to be determined is, whether a slave has been put to work which involves more danger to life or health than is authorized by the general contract of bailment, the fact that the generality

Jones v. Fort.

of prudent masters are in the habit of engaging their own slaves in the same service, may be admissible evidence.—Ala. & T. Railroad Co. v. Burke, 27 Ala. 540; Mosely v. Wilkinson, 30 Ala. 681. This is very different from changing the legal effect of the contract by proof of a local custom.

From what has been said, these conclusions follow:—

(1.) If the raising of a gin-house involves more danger than the ordinary labor of a plantation; and a slave, hired specially for plantation service, is lent by the hirer, for the specific purpose of being engaged in such work, and is killed while so engaged, the hirer is liable to the owner, in trover, for his value, although the killing was the result of inevitable casualty.

(2.) If the slave is held under a general contract of hiring, and is lent by the hirer for the purpose of being engaged in work for the performance of which the generality of prudent masters would not be willing to lend their own slaves, and the slave is killed while engaged in such service, the hirer would be liable for his value to the owner. But, if the work does not involve extraordinary peril—in other words, if prudent masters would, as a general rule, be willing to lend their own slaves for such service—and due care is exercised by the person employing the slave; then, neither the hirer, nor the person to whom the slave is lent, would be liable for his loss.

(3.) If, without the authority of the hirer, (whether his contract be general or special,) the slave is employed by a third person in raising a gin-house, and is killed while so engaged, the person employing him is liable for his value to the owner, no matter what degree of care he exercised in having the work performed.—Collier v. Lyon, 18 Geo. 648; Johnson v. Arabia, 24 Missouri, 86.

Would the result be different, if the slave is actually sent by the hirer, or under his authority, to assist in work forbidden by the scope of his contract with the owner; and the person to whom the slave is so lent, and in whose service he is killed, has no notice of the fact that he is hired, and no reason to suppose that the party from whom he receives him is not the owner? The question is one

which we have felt some difficulty in deciding; but our opinion is, that in the case supposed, the person borrowing the slave, and in whose service he is killed, would be liable in trover to the owner.

The *jus disponendi*—the right of controlling and using property—belongs to the owner;. and he who interferes with the property of another, and appropriates it to his own use, is, as a general rule, a wrong-doer, unless he can show that he had authority for such interference and use, either from the owner or the law. Lord Mansfield uttered a legal truism when he said, that "whoever does an act, by which another person receives an injury, is liable to an action for the injury sustained."—Whitfield ,v. Le Despencer, Cowper, 765. Ordinarily, the liability of the party inflicting the injury, to make reparation to the person injured, does not at all depend upon the motive or intention with which the act was done.—Perminter v. Kelly, 18 Ala. 719; 1 Hilliard on Torts, 99, 100. As an authority from one who had not the right to confer it is void, it is no legal excuse, for an act which causes an injury to another, that the party committing it acted under the direction, or by the consent of a third person, who himself had no right to grant such authority or permission. Hence the well-settled rule, that if the principal is a wrong-doer, the agent, however innocent in intention, who participates in his acts, is also a wrong-doer. Story on Ag. §§ 311–12. It is difficult to perceive any ground, on which a permission from, or a contract with another, who had no right to give the one or make the other, can, as between the person injured and the actual perpetrator of the wrong, change the legal character of the wrongful act, or exempt the author of it from responsibility to the person whom he has injured. It must, therefore, be true, as a general proposition, that if an injurious act be done without sufficient authority, it is no answer to the claim of the owner for redress, that the immediate author of the mischief acted in good faith, by the direction or consent of one whom he supposed to be the owner.

These are elementary principles, and are well sustained

by the authorities.   Thus, in one of the notes to his edition of Blackstone, Mr. Chitty says.: "In every case, where a master has not power to do a thing, whoever does it by his command is a trespasser."—1 Chitty's Black., note, p. 432.   In Perminter v. Kelly, (18 Ala. 716,) this court held, that an agent, *either with or without notice*, is liable in trover, for an act which, if done by his principal, would amount to the conversion of the property of another.    To the same effect is Lee v. Mathews, 10 Ala. 682. In Stephens v. Elwall, (4 M. & S. 259,) a merchant's clerk was held liable, in trover, for goods which he received from a bankrupt and sent to his employer, although they were delivered to him for that purpose, and he did not know that neither the bankrupt nor the merchant had any right to them.    Lord Ellenborough said: "The clerk acted under an *unavoidable ignorance,* and for his *master's benefit,* when he sent the goods to his master; but nevertheless, his acts may amount to a conversion; for a person is guilty of a conversion, who intermeddles with my property, and disposes of it; and it is no answer that he acted under authority from another, who had himself no authority to dispose of it.    And the court is governed by the principle of law, and not by the hardship of any particular case."    So, if an auctioneer should be employed by a sheriff to sell at auction goods which he had unlawfully seized upon an execution—as if the goods did not belong to the execution debtor—the auctioneer who should sell would be liable to an action for the tortious conversion, equally with the sheriff.—Story on Ag. § 312; Farebrother v. Ausley, 1 Campb. R. 343; Adamson v. Jarvis, 4 Bing. R. 66.    In Newsum v. Newsum, (1 Leigh, 94,) it was held, that if an administrator sell a chattel, whereof his intestate died possessed, but which in truth belonged of right to another, and apply the proceeds to payment of his intestate's debts, in due course of administration, without any notice of the right or claim of the true owner, he is personally liable to the true owner for the value, in *trover* brought by the owner against him. Where the widow of a testator, intending to obtain administration of her husband's estate, began to collect his

assets before she had obtained letters, and employed A. to collect the debts owing to the testator, which he accordingly did, and paid the same over to the widow, believing that she was the administratrix; and the widow subsequently died, without obtaining letters of administration,—*held*, that A. was liable to be sued as executor *de son tort*, for the moneys he had received.—Sharland v. Mildon, 5 Hare, 469. These authorities clearly show, that the doctrine, that the possession of an agent is the possession of the principal, has no application to the case of a wrong-doer.—*Ib.* 474; Stephens v. Elwall, 4 M. & S. 259; Snowdon v. Davis, 1 Taunt. 359.

If a slave is sent by the hirer to assist a neighbor, in work forbidden by the hirer's contract with the owner, it cannot be pretended that the use which the neighbor makes of the slave has the sanction of any legal authority. The undertaking of the hirer is, that the slave shall not be employed, either by himself, or by any sub-bailee of his, otherwise than is allowed by the scope of his contract with the owner.—Harris v. Maury, 30 Ala. 681. The hirer has no right to sub-hire, except for purposes consistent with the bailment under which he holds the slave. In the very act of loaning the slave, for a specific purpose forbidden by the contract, the hirer becomes a wrong-doer; and the possession of the loanee is a possession obtained by wrong, and for an unlawful purpose. So far as the owner is concerned, every use of his property must be deemed unlawful, which has not the sanction of his express or implied consent. As we have already seen, the hirer is guilty of a conversion, in permitting the slave to be engaged in a service prohibited by the terms of the original bailment; and upon general legal principles, it seems impossible to escape the conclusion, that the person who actually applies the slave to such service is, as to the owner, equally a wrong-doer. Nor, in the eye of the law, is he less a wrong-doer, because he honestly supposed that the person from whom he obtained the slave was in fact the owner. The ground of liability, in all this class of cases, is injury to another's property, without legal authority for the act which occasioned it.

If the hirer, instead of loaning, had sold the slave, and received the purchase-money, and the slave had been killed while in the service of the purchaser, the right of the owner to recover his value, in trover, would be wholly unaffected by the fact, that the purchaser had bought in good faith, without any notice of the claim of the owner; and yet his claim for exemption from liability would be almost as strong as that of a loanee who, in ignorance of the true proprietorship, and supposing that he had the owner's consent, applies the property of another to a use which leads to its destruction.—See further, Story on Bailm. § 39 (a.); 3 Rob. Prac. 72–75; Poole v. Adkisson, 1 Dana, 112; Featherstonaugh v. Johnston, 8 Taunt. 237; Whitman v. Abernathy, 33 Ala. 154, 161; Agnew v. Johnson, 22 Penn. St. R. 471; James v. Le Roy, 6 Johns. 274.

There is a marked distinction, between the case we have supposed, and that which was presented in Nelson v. Iverson, 17 Ala. 217. That was an action of detinue; and in the course of the opinion the court said: "If the bailee have the temporary possession of the property, holding the same as the property of the bailor, and asserting no title in himself; and, in good faith, in fulfillment of the terms of the bailment, either as expressed by the parties, or implied by law, restores the property to the bailor, before he is notified that the true owner will look to him for it, no action will lie against him; for he has only done what was his duty." This case proceeds upon the principle, that the bailee cannot dispute the title of his bailor; and that as the bailee, in returning the property according to the terms of his contract, only did what he was legally compellable to do, he cannot be liable for the property to another. But one who borrows a slave, for a service in which he is killed, does not occupy the position of a party who has only done that which he was legally bound, and could have been legally compelled to do. In the one case, the return of the property is but the discharge of a legal duty; in the other, an injury to another has been inflicted, by an act purely optional with the author of the mischief. A man shall not be put to answer for that *to which the law obliges him;* but he is

responsible for his voluntary act, where it inflicts injury upon the property of another.

The rule laid down in Nelson v. Iverson, *supra,* when thoroughly analyzed, must, perhaps, be recognized as an exception to the general principles we have stated above. Whilst we are not disposed to disturb that rule, it must be confined to the cases specified in the opinion of the court—that is, to cases where the bailee, in good faith, in fulfillment of the terms of his contract, has restored the property to his bailor, before he is notified that the owner will look to him for it.

Judgment reversed, and cause remanded.